UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAUL AMEZCUA,<br><br>Defendant. | No. 1:93-cr-05046-DAD-1<br><br>ORDER DENYING DEFENDANT AMEZCUA'S MOTION FOR MODIFICATION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)<br><br>(Doc. Nos. 504, 509) |

Pending before the court is a motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) brought on behalf of defendant Raul Amezcua. (Doc. Nos. 504, 509.) That motion is based in part on the purported risks allegedly posed to defendant Amezcua by the ongoing coronavirus ("COVID-19") pandemic. For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On March 11, 1993, defendant Raul Amezcua and his three co-defendants were charged in a superseding indictment with: one count of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1); one count of manufacturing and aiding and abetting the manufacture of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of possession with intent to distribute

1

methamphetamine and aiding and abetting the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (Doc. No. 28.)

On September 21, 1993, the jury trial in this case commenced.  (Doc. No. 128.)  At that trial, the jury heard testimony that defendant Amezcua conspired with his co-defendants to manufacture and distribute methamphetamine in Tulare, Fresno, and San Diego counties in the early 1990s and that he orchestrated the large methamphetamine trafficking operation, including by directing his co-defendants in the manufacture of methamphetamine at two laboratories located in hotel rooms and chicken coop sheds that defendant Amezcua had rented in Visalia and Woodlake, California.  (PSR at 4–9, 17; Doc. No. 516 at 1–2.)[1]  As noted in the Presentence Report ("PSR") prepared by the U.S. Probation Office of this district prior to defendant's sentencing, the amount of methamphetamine involved in this conspiracy was more than 10 kilograms but less than 30 kilograms.  (PSR at 9; Doc. No. 516 at 1.)  After executing search warrants at defendant's hotel rooms and residence, law enforcement agents seized over $80,000 in cash and two loaded handguns, an assault rifle, and ammunition.  (Doc. No. 516 at 4–9.)  One of the seized handguns had been found cocked and loaded in plain view on a shelf in defendant Amezcua's son's bedroom closet.  (*Id.* at 9.)

On October 7, 1993, following a twelve-day trial, the jury found defendant Amezcua guilty on all counts.  (Doc. Nos. 145, 147.)  Following his conviction, it was determined that under the U.S. Sentencing Guidelines, defendant Amezcua's total offense level was 46 and his criminal history category was III, resulting in a sentencing guideline range calling for a sentence of life imprisonment.  (PSR at 9–12, 15–16.)  On November 21, 1994, the sentencing judge adopted the PSR's recommendation and sentenced defendant to life imprisonment as to counts one, two, and three, with those terms to be served concurrently, followed by a 60-month term of supervised release, and the mandatory $150 special assessments.  (Doc. Nos. 251, 287.)

---

[1] The initiating of this prosecution in 1993 pre-dates the CM/ECF system that federal courts have employed for many years.  In this case, aside from the electronic entry of court orders beginning in 1999 and a few other entries, electronic entries do not consistently appear on the docket until 2005.  The undersigned has obtained a copy of the Presentence Report ("PSR") from the U.S. Probation Office and has relied in part upon that document for this background.  However, the court also notes that in 1993, presentence reports were not filed on the court's public docket.

1       Thereafter, defendant filed several motions pursuant to 28 U.S.C. § 2255 seeking to vacate, set aside, or correct his sentence, of which the first was denied by the then-assigned district judge on September 21, 1998, and defendant's successive petitions were dismissed on August 27, 2012 and July 11, 2014. (Doc. Nos. 380, 464, 467.) Defendant also filed a motion pursuant to 18 U.S.C. § 3582(c)(2), seeking a reduction in his sentence on the basis of Amendment 782 to the Sentencing Guidelines, which revised the Drug Quantity Table in USSG § 2D1.1 and reduced the offense level applicable to many drug trafficking offenses, including defendant's offense in this case. (Doc. No. 468.) On January 23, 2015, the court denied defendant's § 3582 motion, explaining that

> [u]nder the amended guideline, the base offense level for this amount of actual methamphetamine is 38, and the adjusted offense level is 44. At the established criminal history category of III, the defendant's sentencing range is still life in prison. Because the pertinent amendment does not result in a different sentencing range, the defendant is not eligible for a sentencing reduction pursuant to Title 18, United States Code, Section 3582(c).

(Doc. No. 472 at 2) (citing *United States v. Leniear*, 574 F.3d 668, 673–74 (9th Cir. 2009)).

      Defendant is currently in the custody of the U.S. Bureau of Prisons ("BOP") and serving his life sentence at United States Penitentiary, Victorville ("USP Victorville"). (Doc. No. 509 at 2–3.) On August 7, 2020, defendant filed a *pro se* motion seeking a reduction of his sentence and immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. No. 504.) The court referred defendant's motion to the Federal Defender's Office ("FDO"). (*See* Doc. No. 507, 508.) On July 6, 2020, the FDO filed an amended motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on behalf of defendant. (Doc. No. 509.) The government filed its opposition to the pending motion on November 5, 2020, and on December 26, 2020, defendant filed his reply thereto. (Doc. Nos. 516, 528.)

## LEGAL STANDARD

      A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."). Those limited

circumstances include compassionate release in extraordinary cases. *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

---

[2] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial

4

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, a large and growing number of district courts across the country have concluded that because the Sentencing Commission has not amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c). *See, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 979 (C.D. Cal. 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

---

intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[4] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district courts to have done so agree that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*. Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

*Rodriguez,* 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, No. 16-cr-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 970; *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

**A.    Administrative Exhaustion**

Defendant asserts, and the government does not dispute, that defendant has exhausted his administrative remedies prior to filing his pending § 3582 motion. (Doc. Nos. 509 at 3; 516 at 4.) Because failure to exhaust is normally viewed as an affirmative defense, which must be pled and proven, the court will accept the government's concession and turn to the merits of defendant's motion.

6

**B.     Extraordinary and Compelling Reasons**

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions for reductions in their sentence under the FSA. *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id*. In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

> The defendant is
>
> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id*. at cmt. n.1(A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, many courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release when the particular circumstances of a case are considered in their totality. *See, e.g.*, *Parker*, 461 F. Supp.

3d at 980 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405 (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[5]

Defendant Amezcua argues that extraordinary and compelling reasons warranting a reduction of his sentence to time served now exist because: (1) according to the Centers for Disease Control and Prevention ("CDC"), he faces an increased risk of suffering severe illness from the virus that causes COVID-19 based on his age of 59 years old, his chronic medical conditions of moderate-to-severe asthma and hypertension, and his history of smoking tobacco cigarettes since he was nine years old; (2) he is unable to provide self-care in USP Victorville, where he cannot practice effective social distancing and hygiene in his dorm-style setting with large groups of prisoners and guards rotating throughout the Victorville complex; and (3) USP Victorville is experiencing a resurgent outbreak with skyrocketing rates of COVID-19 infections. (Doc. Nos. 509 at 6–11; 528 at 4–10.)

In its opposition, the government contends that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison" is not an extraordinary and compelling reason supporting defendant's early release from imprisonment. (Doc. No. 516 at 9.)

---

[5] Here, however, because defendant Amezcua is only 59 years old (Doc. Nos. 509 at 12; 528 at 12), his age and age-related factors do not play a role in consideration of his pending motion.

1  The government also argues that defendant has failed to carry his burden to establish his
2  eligibility for compassionate release because he "does not have a condition that diminishes his
3  ability of self-care within the prison facility," and his BOP medical records show that he is being
4  appropriately treated for his medical conditions of asthma, hypertension, and hyperlipidemia. (*Id.*
5  at 8–9; *see also* Doc. Nos. 513, 514.) Moreover, the government contends that those conditions
6  are not CDC-recognized high risk factors with respect to COVID-19. (Doc. No. 516 at 9–10.)
7  According to the government, the CDC has not identified hyperlipidemia as a risk factor, and the
8  CDC identified general non-pulmonary hypertension and moderate-to-severe asthma as
9  conditions that "might" increase risk of severe illness if one contracts COVID-19. (*Id.*) The
10 government also disputes the severity of defendant's asthma condition, focusing on the fact that
11 defendant's medical records do not reflect that he has been diagnosed with "moderate to severe
12 asthma." (*Id.*)

13       In reply, defendant asserts that his asthma is "severe persistent" according to BOP's
14 Clinical Practice Guidelines for classifying asthma severity, because he uses a prescribed
15 albuterol inhaler multiples times per day and a prescribed Mometasone inhaled corticosteroid
16 daily for long term control of his asthma. (Doc. Nos. 528 at 4–7; 528-1 at 2.) Defendant also
17 points to his BOP medical records, filed under seal in this case, which reflect that both inhalers
18 have been consistently prescribed by the BOP to treat defendant's asthma over the last two years.
19 (Doc. Nos. 528 at 5; 513 at 20–23, 37, 40; 514.) In addition, defendant has filed a declaration
20 from Dr. Catherine A. Pearson, a practicing internal medicine physician and clinical instructor of
21 infectious diseases at the University of California, San Francisco, who concluded that defendant
22 "closely meets the criteria for severe-persistent asthma" based upon her review of defendant's
23 BOP medical records and defendant's declaration summarizing his symptoms. (Doc. Nos. 528 at
24 6–7; 528-3 at 3–5.) Defendant does not dispute that hypertension alone merely *may* increase the
25 risk of severe illness from COVID-19, but contends that in combination with his asthma, and his
26 age of 59 and history of cigarette smoking—for which there are higher rates of hospitalizations
27 and death from COVID-19 according to Dr. Pearson—he is in fact at a higher risk of suffering
28 severe illness if he were to contract COVID-19. (Doc. No. 528 at 7–9.)

It is undisputed that according to the CDC, "[a]dults of any age" who have certain medical conditions including "moderate-to-severe asthma," or who have a history of smoking, are "at increased risk of severe illness from the virus that causes COVID-19," and adults with hypertension "might be at an increased risk for severe illness from the virus that causes COVID-19." *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated December 29, 2020); (Doc. Nos. 516 at 9–10; 528 at 6–8). Here, the court finds that the absence of a formal diagnosis of moderate-to-severe asthma does not mean that defendant Amezcua is not at an increased risk of suffering severe illness if he were to contract COVID-19 due to his asthma condition, the symptoms of which have been well documented over the last several years and for which he has been prescribed albuterol and corticosteroid inhalers by prison medical staff. (*See* Doc. No. 513, 514.)

The court also notes, however, that defendant has not argued that USP Victorville is unable to monitor and adequately treat his medical conditions. *See United States v. Ayon-Nunez*, No. 1:16-cr-00130-DAD, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release.") (internal quotation marks and citation omitted). In fact, the medical records filed with the court under seal suggest that USP Victorville is providing adequate medical care to defendant because he is being prescribed and provided the medications necessary to self-care for his health conditions. Thus, the court is not persuaded that the higher risk of severe illness from COVID-19 that defendant faces, based on his medical conditions and history of smoking, rises to the level of an extraordinary and compelling reason supporting compassionate release. *See, e.g.*, *United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. April 24, 2020) (finding that defendant "has been unable to self-care in a BOP facility already overburdened by its COVID-19 response" where defendant could not receive breathing treatments to clear his lungs as required to treat his asthma, despite repeated requests for them); *United States v. Adeyemi*, No. 06-cr-124, 2020 WL 3642478, at *19 (E.D. Pa. July 6, 2020) (finding no extraordinary and compelling

/////

reason even though a potential lag in medication prescription refills of defendant's inhaler might impact his ability to self-manage his mild asthma).

Rather, defendant merely asserts in somewhat conclusory fashion that his "serious medical conditions [] substantially diminish his ability to provide self-care at USP Victorville." (Doc. No. 528 at 9.) The court acknowledges that the sheer number of positive COVID-19 cases at USP Victorville may impact defendant Amezcua's ability to provide self-care. It has been recognized by some courts that "the presence of COVID 19 . . . necessitates a more expansive interpretation of what self-care means" and that an inability of individuals at high risk of becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask and maintain social distancing may constitute an inability to provide self-care. *See Gorai*, 2020 WL 1975372, at *3 (citation omitted). In particular, here defendant emphasizes the resurgent outbreak of COVID-19 in USP Victorville, and his inability to practice social distancing and hygiene because he "lives with a large group of prisoners in a dorm-style setting, and [] the guards at Victorville rotate throughout the complex." (Doc. No. 509 at 10; 528 at 9–10.) In his reply, defendant notes that as of November 5, 2020 (the date of the government's opposition), the BOP reported that four inmates and four staff members were confirmed with active COVID-19 cases in USP Victorville, and that as of December 26, 2020, the BOP was reporting that 177 inmates and 24 staff members were by then confirmed with active COVID-19 cases. (*Id.* at 9.)[6] Defendant also cites to the district court's decision in *United States v. Pacheco*, No. 17-cr-00003-DWF-HB, 2020 WL 7261109, at *2 (D. Minn. Dec. 10, 2020), granting a reduction of the sentence of an inmate incarcerated in one of the Victorville complex carceral facilities, in which the court noted "the danger posed by the skyrocketing rate of COVID-19 infection at FCI Victorville Medium II, which went from 1 infected inmate to 194 infected inmates during the short briefing schedule on this motion." (Doc. No. 528 at 10.) Similarly, in *United States v. Heffington*, No. 1:93-cr-05021-NONE, 2020 WL 4476485, at *7 (E.D. Cal. Aug. 4, 2020), this court granted compassionate

---

[6] USP Victorville has a total population of 1,166 inmates. USP Victorville, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/vip/ (last visited January 12, 2021).

release to an inmate in FCI Victorville, noting that "in just 111 days the active COVID-19 virus cases at FCI Victorville went from 0 to 113," and concluding that

> [t]his development is more than sufficient to convince this court that the defendant's advanced age, medical conditions and the fact that several of those conditions place him at higher risk of becoming seriously ill if infected by COVID-19, when considered in combination with the outbreak of the virus at his prison of confinement, constitute extraordinary and compelling reasons warranting a reduction of his sentence.

Here, the court notes that as of January 12, 2021, the BOP reported that 108 prisoners and 28 staff members at USP Victorville were confirmed as active COVID-19 cases. *See* https://www.bop.gov/coronavirus/ (last reviewed Jan. 12, 2021).[7] Thus, in the few weeks since defendant filed his reply at the end of December 2020, it appears that the number of active cases at USP Victorville have substantially decreased from 177 active cases among inmates down to 108. There is, of course, still no doubt that USP Victorville has suffered from a significant COVID-19 outbreak. However, that outbreak alone is not sufficient to demonstrate that extraordinary and compelling reasons exist for compassionate release especially where prison officials and medical staff have acted so as to currently bring the outbreak under some degree of control. *See United States v. Rios-Ayon*, No. 1:16-cr-00096-NONE, 2020 WL 7646408, at *6 (E.D. Cal. Dec. 23, 2020) ("While it is clear that FCI Victorville is still managing to control the outbreak at that prison to some extent, that alone does not tip the scales in favor of defendant's compassionate release in light of all the other relevant circumstances.").

Accordingly, the court concludes that defendant Amezcua has not demonstrated that his medical conditions, even in combination with the COVID-19-related conditions at USP Victorville, support a finding that his ability to provide self-care within the prison setting has been substantially diminished at this time. Thus, defendant has not shown extraordinary and compelling reasons exist that warrant a reduction of his sentence under § 3582(c)(1)(A). Therefore, his motion will be denied.

---

[7] The undersigned does not necessarily accept these reported numbers at face value given the manner in which the CDC guidelines apparently allow for individuals to be counted as recovered from the virus without confirming test results. However, there is also no evidence before the court contradicting those reported numbers.

**C.    Consistency with the § 3553(a) Factors**

Finally, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A) must be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).[8] *See Parker*, 461 F. Supp. 3d at 979. Although not necessary for purposes of resolving the pending motion, the court nonetheless feels compelled to explain its view that consideration of the § 3553(a) sentencing factors would appear to, in fact, support defendant Amezcua's release.

Defendant argues that a reduction of his sentence to time served is consistent with the sentencing factors because:  (1) his offense was non-violent; (2) he has demonstrated remarkable rehabilitation and remorse; (3) at age 58, his recidivism risk is low; and (4) he has already served more than 27 years in prison, which is "sufficient but not greater than necessary to effectuate the traditional goals of sentencing." (Doc. Nos. 509 at 11–12; 528 at 1, 13–14.) Defendant asserts that he has "built a solid record of achievements, obtaining his GED, successfully completing classes, and working hard to become a valuable and trusted Unit Team orderly." (Doc. No. 528 at 12.) Defendant also filed letters of support written by other federal prisoners who have been mentored by defendant, in which those inmates describe defendant's guidance, kindness, and compassion. (Doc. Nos. 528, 528-4.) The undersigned pauses to note how compelling many of those letters are. (*See* Doc. Nos. 509-3, 528-4.) It is apparent that defendant Amezcua has served as a valuable and positive mentor to other younger federal prisoners during the service of his sentence.

/////

---

[8] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

The government counters that "[g]iven the nature and circumstances of Amezcua's crimes, his criminal history, characteristics, and his threat to the public, a sentence reduction is inconsistent with a careful weighing of the § 3553(a) factors and a sentence reduction is not warranted." (Doc. No. 516 at 12.) In addition to the seriousness of defendant's drug-trafficking activity which resulted in his convictions, the government emphasizes that defendant's criminal history "includes reckless driving, inflict[ing] corporal injury on spouse, as well as arrests (but not convictions) for assault with a deadly weapon, alien smuggling, and conspiracy to manufacture methamphetamine." (*Id.*) The government also argues that defendant "poses a very real danger to the community if released" because his conduct while in prison shows that he remains dangerous, noting that defendant has been sanctioned for several disciplinary actions while in BOP custody, including "rioting (2009), possession of drugs (2013), and possession of a dangerous weapon (2017)." (*Id.* at 11.)

In reply, defendant urges the court to consider that people can and do change over time, and he cites to several district court decisions in which sentence reductions were granted in similar circumstances, including reduction of life sentences, notwithstanding the seriousness of the defendant's original drug-trafficking offense(s) and the occurrence of minor disciplinary infractions while in custody. (Doc. No. 528 at 11–13.) As to his three prison disciplinary incidents, defendant emphasizes that his disciplinary record was not cited by the warden at his prison of confinement as a ground for denying defendant's request for compassionate relief, and that the BOP considered the 2009 rioting and 2013 possession of marijuana to be minor infractions as shown by the minimal sanctions imposed upon him as a result (loss of commissary and segregation and impoundment). (*Id.* at 12–13.) Defendant also explained that "[a]s for the 2017 charge, for which [he] lost 41 days of good conduct time and six months commissary privilege, a weapon was found in a holding cell [that he] had briefly occupied," and "[h]e denied possessing the weapon and said it was not his." (*Id.* at 13.) Defendant contends that his "few, far between, and minor" disciplinary incidents "pale before the solid record of accomplishments and positive programming [he] has built since 1995," and "are simply not proof [that] he would be a danger to society if released." (*Id.*)

14

As an initial matter, the court notes that the fact that defendant is currently serving a life sentence of imprisonment does not preclude the court from granting compassionate release. Even before the COVID-19 pandemic, courts recognized that circumstances could warrant the granting of compassionate release even in the case of prisoners serving life sentences. *See United States v. McGraw*, No. 2:02-cr-00018-LJM, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (ordering the compassionate release of a defendant who had served 16 years of his life sentence following his conviction for conspiracy to possess with the intent to distribute and distribution of 20 pounds of methamphetamine, and was now 72 years old and suffering from diabetes, hyperlipidemia, emphysema, stage three kidney disease, and hepatitis C); *United States v. Kubinski*, No. 3:93-cr-00028-H, 2020 WL 2475859, at *1 (E.D.N.C. May 13, 2020) (granting release despite the imposition of four life sentences because the defendant's crimes were for nonviolent drug distribution and conspiracy). The court also agrees that a few relatively minor prison disciplinary infractions does not necessarily preclude the granting of compassionate release. *See Heffington*, 2020 WL 4476485, at *8 (concluding that "[e]ngaging in a single prison fist-fight with no involvement of weapons over the course of living in prison for 27 years does not come close to outweighing all of the factors supporting defendant's compassionate release"); *United States v. Neal*, No. 2:09-cr-00089-JAM-KJN, 2020 WL 4476718, at *3 (E.D. Cal. Aug. 4, 2020) (granting release despite expressing concern that defendant played a role in "two in-custody assaults over the past four years" because "viewing [defendant's] record as a whole," "the steps she's taken toward self-reflection and rehabilitation paint a more accurate picture of her time in prison than do the missteps she's made along the way").

The court recognizes the seriousness of defendant's offenses of conviction and agrees that the nature of this offense is one that evinces a danger to the safety of the community. Defendant was convicted in 1993 of very serious offenses—he led a conspiracy that produced for distribution over 10 kilograms of methamphetamine. (Doc. Nos. 145, 147.) However, for that offense, defendant has already served over 27 years in prison. (Doc. No. 528 at 2.) In light of his demonstrated rehabilitation over the last 27 years in prison, the court is not persuaded by the government's argument that defendant poses an ongoing danger to the public. While the court

15

1    recognizes that rehabilitation alone is not enough to warrant compassionate release, *see* 28 U.S.C.
2    § 994(t); U.S.S.G. § 1B1.13, cmt. n.3, in the undersigned's view, serving over 27-years in prison
3    clearly reflects the seriousness of defendant's offenses of conviction, is sufficient to promote
4    respect for the law, and provides just punishment while also affording adequate deterrence to
5    criminal conduct.  *See* 18 U.S.C. § 3553(a)(2)(A), (B).

6         Nevertheless, compassionate release under § 3582(c)(1)(A) is clearly not a general
7    reconsideration of sentencing provision akin to the prior version of Rule 35 of the Federal Rules
8    of Criminal Procedure.  Nor may the court rely on § 3582(c)(1)(A) to modify a sentence to one
9    which the undersigned might find to be fair and reasonable were the court to be called upon to
10   sentence today.  Instead, because defendant has not shown extraordinary and compelling reasons
11   exist that warrant a reduction of his sentence under the provisions of § 3582(c)(1)(A), his motion
12   must be denied at this time.

13   **CONCLUSION**

14        Defendant Amezcua has made a persuasive case that his release from imprisonment after
15   serving over twenty-seven years in prison would be consistent with consideration of the
16   sentencing factors set forth in 18 U.S.C. § 3553(a).  However, he has not shown "extraordinary
17   and compelling" reasons that could justify his release under 18 U.S.C. § 3582(c)(1)(A).
18   Accordingly, defendant's motion for compassionate release (Doc. Nos. 504, 509) is denied.

19   IT IS SO ORDERED.

20       Dated:  **January 15, 2021**
21                                               UNITED STATES DISTRICT JUDGE