UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  1:93-cr-05046-DAD-1 |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANT AMEZCUA'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582 |
| RAUL AMEZCUA, | |
| Defendant. | (Doc. Nos. 504, 509) |

This matter is before the court on the motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) filed on behalf of defendant Raul Amezcua,[1] which was remanded by the Ninth Circuit to this court on April 16, 2021 for further consideration in light of that court's intervening decision in *United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021).  (Doc. No. 534.) The motion is based, in part, on the purported risks allegedly posed to defendant Amezcua by the ongoing coronavirus ("COVID-19") pandemic.  On June 30, 2021, the court held a hearing on the motion and took it under submission.  (Doc. No. 547.)  Assistant Federal Defender David M. Porter appeared on behalf of defendant Amezcua at the hearing.  Assistant U.S. Attorney

---

[1]  The court will use the surname Amezcua, which is consistent with the surname defendant has used in his own filings (*see* Doc. No. 499) and how defendant's name appears on this docket in this action, even though the BOP records that the government submitted in support of their opposition to the pending motion and BOP's inmate locator both reflect defendant's surname as "Amescua" rather than "Amezcua" (*see* Doc. No. 516-1).

1

Vincente Tennerelli appeared on behalf of the government.  For the reasons explained below, defendant's motion will now be granted.[2]

## BACKGROUND

On March 11, 1993, defendant Raul Amezcua and his three co-defendants were charged in a superseding indictment with:  one count of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1); one count of manufacturing and aiding and abetting the manufacture of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of possession with intent to distribute methamphetamine and aiding and abetting the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (Doc. No. 28.)

On September 21, 1993, the jury trial in this case commenced.  (Doc. No. 128.)  At that trial, the jury heard testimony that defendant Amezcua conspired with his co-defendants to manufacture and distribute methamphetamine in Tulare, Fresno, and San Diego counties in the early 1990s and that he orchestrated a large methamphetamine trafficking operation, including by directing his co-defendants in the manufacture of methamphetamine at two laboratories located in hotel rooms and chicken coop sheds that defendant Amezcua had rented in Visalia and Woodlake, California.  (PSR at 4–9, 17; Doc. No. 516 at 1–2.)[3]  As was later noted in the presentence report

---

[2]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's overwhelming caseload has been well publicized and the long-standing lack of adequate judicial resources in this district long-ago reached crisis proportion.  While that situation was partially addressed by the U.S. Senate's confirmation of district judges for two of this court's vacancies on December 17, 2021 and June 21, 2022, another vacancy on this court with only six authorized district judge positions was created on April 17, 2022.  For over twenty-two months the undersigned was left presiding over approximately 1,300 civil cases and criminal matters involving 735 defendants.  That situation resulted in the court not being able to issue orders in submitted matters within an acceptable period of time and continues even now as the undersigned works through the predictable backlog.  This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties.

[3]  The initiating of this prosecution in 1993 pre-dates the CM/ECF system that federal courts have employed for many years.  In this case, aside from the electronic entry of court orders beginning in 1999 and a few other entries, electronic entries do not consistently appear on the docket until 2005.  The undersigned has obtained a copy of the Presentence Report ("PSR") from the U.S. Probation Office and has relied in part upon that document for this background.  However, the court also notes that in 1993, presentence reports were not filed on the court's public docket.

1  (PSR) prepared by the U.S. Probation Office of this district prior to defendant's sentencing, the

2  amount of methamphetamine involved in this conspiracy was more than 10 but less than 30

3  kilograms.  (PSR at 9; Doc. No. 516 at 1.)  After executing search warrants at defendant's hotel

4  rooms and residence, law enforcement agents seized over $80,000 in cash and two loaded

5  handguns, an assault rifle, and ammunition.  (Doc. No. 516 at 4–9.)  One of the seized handguns

6  had been found in plain view on a shelf in defendant Amezcua's son's bedroom closet and was

7  cocked and loaded.  (*Id.* at 9.)

8       On October 7, 1993, following a twelve-day trial, the jury found defendant Amezcua

9  guilty on all counts.  (Doc. Nos. 145, 147.)  Following his conviction, it was determined that

10  under the U.S. Sentencing Guidelines, defendant Amezcua's total offense level was 46 and his

11  criminal history category was III, resulting in a sentencing guideline range calling for a sentence

12  of life imprisonment.  (PSR at 9–12, 15–16.)  On November 21, 1994, the sentencing judge

13  adopted the PSR's recommendation and sentenced defendant to life imprisonment as to counts

14  one, two, and three, with those terms to be served concurrently, followed by a 60-month term of

15  supervised release, and imposed the mandatory $150 special assessments.  (Doc. Nos. 251, 287.)

16       Thereafter, defendant Amezcua filed several motions pursuant to 28 U.S.C. § 2255

17  seeking to vacate, set aside, or correct his sentence.  The first of those § 2255 motions was denied

18  by the then-assigned district judge on September 21, 1998, and defendant's successive motions

19  were dismissed on August 27, 2012 and July 11, 2014.  (Doc. Nos. 380, 464, 467.)  Defendant

20  also filed a motion pursuant to 18 U.S.C. § 3582(c)(2), seeking a reduction in his sentence on the

21  basis of Amendment 782 to the Sentencing Guidelines, which amendment had revised the Drug

22  Quantity Table in USSG § 2D1.1 and reduced the offense level applicable to many drug

23  trafficking offenses, including defendant's offense in this case.  (Doc. No. 468.)  On January 23,

24  2015, the court denied defendant's § 3582 motion, explaining that

25           [u]nder the amended guideline, the base offense level for this
              amount of actual methamphetamine is 38, and the adjusted offense
26           level is 44.  At the established criminal history category of III, the
              defendant's sentencing range is still life in prison.  Because the
27           pertinent amendment does not result in a different sentencing range,
              the defendant is not eligible for a sentencing reduction pursuant to
28           Title 18, United States Code, Section 3582(c).

3

1    (Doc. No. 472 at 2) (citing *United States v. Leniear*, 574 F.3d 668, 673–74 (9th Cir. 2009)).

2           Defendant is currently in the custody of the U.S. Bureau of Prisons ("BOP") and serving

3    his life sentence at United States Penitentiary, Victorville ("USP Victorville").  (Doc. No. 509 at

4    2–3.)  On August 7, 2020, defendant filed a *pro se* motion seeking a reduction of his sentence and

5    immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 504.)  The court referred

6    defendant's motion to the Federal Defender's Office ("FDO") for this district.  (*See* Doc. No. 507,

7    508.)  On July 6, 2020, the FDO filed an amended motion for compassionate release under 18

8    U.S.C. § 3582(c)(1)(A) on behalf of defendant.  (Doc. No. 509.)  The government filed its

9    opposition to the pending motion on November 5, 2020, and on December 26, 2020, defendant

10   filed his reply thereto.  (Doc. Nos. 516, 528.)[4]

11          On January 19, 2021, the court denied defendant Amezcua's motion for compassionate

12   release, concluding that he had "made a persuasive case that his release from imprisonment after

13   serving over twenty-seven years in prison would be consistent with consideration of the

14   sentencing factors set forth in 18 U.S.C. § 3553(a)" but that he had "not shown 'extraordinary and

15   compelling' reasons that could justify his release under 18 U.S.C. § 3582(c)(1)(A)."  (Doc. No.

16   529 at 16.)  Defendant Amezcua appealed from the court's January 19, 2021 order denying his

17   motion for compassionate release.  (Doc. No. 530.)  On April 16, 2021, as noted above, the Ninth

18   Circuit vacated this court's order and remanded "so that the district court can reassess Amezcua's

19   motion for compassionate release under the standard set forth [in *Aruda*.]"  (Doc. No. 534 at 2.)

20   In its remand order, the Ninth Circuit "offer[ed] no views as to the merits of Amezcua's

21   § 3582(c)(1)(A)(i) motion."  (*Id.*)

22          On May 3, 2021, defendant filed a brief on remand.  (Doc. No. 535.)  On May 25, 2021,

23   the government filed its brief in response.  (Doc. No. 538.)  On June 2, 2021, defendant filed his

24   reply thereto.  (Doc. No. 545.)  On June 30, 2021, the court held a hearing on the pending motion,

25   focusing on the standard that district courts were to apply in determining whether to grant relief

26   /////

27   _____

28   [4]  While defendant's motion was pending, he contracted COVID-19 in December 2020.  (Doc.
     Nos. 538 at 7; 542 at 199—sealed.)

1  under 18 U.S.C. § 3582(c)(1)(A)(i) in light of the Ninth Circuit's decision in *Aruda*.  (Doc. No.

2  547.)

3         While defendant Amezcua's motion has been pending before this court on remand, he

4  received both doses of the Pfizer-BioNTech COVID-19 vaccine; receiving the first dose on April

5  21, 2021 and the second dose of the vaccine on May 11, 2021.  (Doc. Nos. 538 at 7; 542 at 210—

6  sealed.)  In September 2021, the parties filed supplemental briefing regarding the efficacy of

7  vaccinations against then-emerging COVID-19 variants.  (Doc. Nos. 548–50, 552–53.)

8         On June 24, 2022, defendant Amezcua filed a request for a ruling on his pending motion.

9  (Doc. No. 555.)  On September 23, 2022, defendant Amezcua filed a notice of supplemental

10  authority.  (Doc. No. 556.)  The court then directed the government to respond to the arguments

11  presented therein (Doc. No. 557), which the government did on September 29, 2022.  (Doc. No.

12  558.)  Defendant filed his reply thereto on October 3, 2022.  (Doc. No. 559.)

13                            **LEGAL STANDARD**

14         A court generally "may not modify a term of imprisonment once it has been imposed."

15  18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment

16  of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may

17  not be modified by a district court except in limited circumstances.").  Those limited

18  circumstances include compassionate release in extraordinary cases.  *See United States v. Holden*,

19  452 F. Supp. 3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018

20  ("the FSA"), motions for compassionate release could only be filed by the BOP.  18 U.S.C.

21  § 3582(c)(1)(A) (2002).  Under the FSA, however, imprisoned defendants may now bring their

22  own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).

23  In this regard, the FSA specifically provides that a court may

24  /////

25  /////

26  /////

27  /////

28  /////

upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[5] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –

(i)   extraordinary and compelling reasons warrant such a reduction; or

(ii)   the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 1B1.13 (U.S. Sent'g Comm'n 2018)[6]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash.

---

[5] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[6] According to U.S.S.G. § 1B1.13(2), to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). However, as the Ninth Circuit has clarified, "[t]his dangerousness finding is not statutorily required under 18 U.S.C. § 3582(c)(1)(A)(i), but [it] is part of the Sentencing Commission's policy statement in U.S.S.G. § 1B1.13(2)." *United States v. Aruda*, 993 F.3d 797, 799 (9th Cir. 2021).

1    2020) (noting that many courts have relied on U.S.S.G. § 1B1.13 to define "extraordinary and

2    compelling reasons," even though that policy statement was issued before Congress passed the

3    FSA and authorized defendants to file compassionate release motions).  However, the Ninth

4    Circuit has held "that the current version of U.S.S.G. § 1B1.13 is not an 'applicable policy

5    statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant." *United States v.*

6    *Aruda*, 993 F.3d 797, 802 (9th Cir. 2021).  "In other words, the Sentencing Commission has not

7    yet issued a policy statement 'applicable' to § 3582(c)(1)(A) motions filed by a defendant." *Id.*

8    The Ninth Circuit clarified that "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13

9    may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they

10   are not binding." *Id.* (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

11          In so holding, the Ninth Circuit joined the five other circuits who have addressed this

12   issue and have unanimously held "that U.S.S.G. § 1B1.13 only applies to § 3582(c)(1)(A)

13   motions filed by the BOP Director, and does not apply to § 3582(c)(1)(A) motions filed by a

14   defendant." *Id.*; *see, e.g.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020)

15   ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and

16   compelling reasons that an imprisoned person might bring before them in motions for

17   compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated

18   version of Guideline § 1B1.13, limits the district court's discretion."); *United States v. Jones*, 980

19   F.3d 1098, 1111 (6th Cir. 2020) ("In cases where incarcerated persons file motions for

20   compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have

21   full discretion to define 'extraordinary and compelling' without consulting the policy statement

22   § 1B1.13."); *Gunn*, 980 F.3d at 1181 ("[T]he Guidelines Manual lacks an 'applicable' policy

23   statement covering prisoner-initiated applications for compassionate release.  District judges must

24   operate under the statutory criteria—'extraordinary and compelling reasons'—subject to

25   deferential appellate review."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ( "In

26   short, we agree with the Second Circuit and the emerging consensus in the district courts:  There

27   is as of now no 'applicable' policy statement governing compassionate-release motions filed by

28   defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are

'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'") (citation omitted); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) ("We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test, its finding that extraordinary and compelling reasons warranted a reduction in Maumau's case was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G. § 1B1.13.").

It is now settled that "[i]n the absence of an applicable policy statement from the Sentencing Commission, the determination of what constitutes extraordinary and compelling reasons for sentence reduction lies squarely within the district court's discretion." *United States v. Chen*, __ F.4th __, No. 20-50333, 2022 WL 4231313, at *3 (9th Cir. Sept. 14, 2022). As the Supreme Court has recently held, "[i]t is only when Congress or the Constitution limits the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence, that a district court's discretion to consider information is restrained." *Concepcion v. United States*, __ U.S. __, 142 S. Ct. 2389, 2396 (2022).

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district courts to have done so agree that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if

8

"extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id*. Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

*United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *see also United States v. Parker*, 461 F. Supp. 3d 966, 970 (C.D. Cal. 2020); *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, release must be "consistent with" the sentencing factors set forth in § 3553(a)).

## A.    Administrative Exhaustion

Defendant asserts, and the government does not dispute, that defendant has exhausted his administrative remedies prior to filing his pending § 3582 motion.  (Doc. Nos. 509 at 3; 516 at 4.) Because failure to exhaust is normally viewed as an affirmative defense, which must be pled and proven, the court will accept the government's concession and turn to the merits of defendant's motion.

## B.    Extraordinary and Compelling Reasons

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, and that policy statement "is not an 'applicable policy statement' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant," courts have agreed that defendants may support their own motions for reductions in their sentence under the FSA by asserting extraordinary and compelling reasons exist based on "other reasons."  *Aruda*, 993 F.3d at 802 ("The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding."); *see also United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

In the pending motion and in his supplemental briefing, defendant Amezcua argues that extraordinary and compelling reasons warranting his compassionate release exist on two

independent grounds:  (1) his medical conditions in combination with the risks posed to him by the COVID-19 pandemic, and (2) "other reasons" due to his sentence of life imprisonment having been imposed under a now-defunct, unconstitutional mandatory sentencing regime.  The court will address each ground in turn.

1.  Medical Conditions Warranting Compassionate Release

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1(A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia."  *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

> The defendant is
>
> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at cmt. n.1(A)(ii).  Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, many courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release when the particular circumstances of a case are considered in their totality.  *See, e.g.*, *Parker*, 461 F. Supp. 3d at 980 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405

10

(E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence.  But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors.  Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).  This provision does not apply here because, although defendant Amezcua has effectively served a term of 34 years in prison, he is currently only 60 years old.  (Doc. Nos. 509 at 12; 528 at 12.)[7]

In his pending motion for compassionate release, defendant Amezcua argues that extraordinary and compelling reasons warranting a reduction of his sentence to time served now exist because:  (1) according to the U.S. Centers for Disease Control and Prevention ("CDC"), he faces an increased risk of suffering severe illness from the virus that causes COVID-19 based on his age of 60 years old, his chronic medical conditions of moderate-to-severe asthma and hypertension, and his history of smoking tobacco cigarettes since he was nine years old; (2) he is unable to provide self-care in USP Victorville, where he cannot practice effective social distancing and hygiene in his dorm-style setting with large groups of prisoners and guards rotating throughout the Victorville complex; and (3) USP Victorville [had been] experiencing a resurgent outbreak with skyrocketing rates of COVID-19 infections.  (Doc. Nos. 509 at 6–11; 528 at 4–10.)

---

[7]  In determining a defendant's projected release date, courts may take into account any "good time credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. § 3624(b)(1).  *See, e.g.*, *United States v. Burrill*, No. 17-cr-00491-RS, 2020 WL 1846788, at *1 n.1 (N.D. Cal. Apr. 10, 2020).  By the court's calculation, as of October 6, 2022, defendant Amezcua has served 29 years, 8 months, and 15 days (nearly 356 months).  (*See* Doc. No. 516-1 at 4.)  Accounting for good time credits of 54 days for every year served, defendant would have accrued 1,603 days of good time credit, meaning that defendant has effectively served approximately 408 months (just over 34 years) in federal prison.

1    In its opposition, the government contends that "the mere existence of COVID-19 in

2    society and the possibility that it may spread to a particular prison" is not an extraordinary and

3    compelling reason supporting defendant's early release from imprisonment.  (Doc. No. 516 at 9.)

4    The government also argues that defendant Amezcua has failed to carry his burden to establish

5    his eligibility for compassionate release because he "does not have a condition that diminishes his

6    ability of self-care within the prison facility," and his BOP medical records show that he is being

7    appropriately treated for his medical conditions of asthma, hypertension, and hyperlipidemia.  (*Id.*

8    at 8–9; *see also* Doc. Nos. 513, 514.)  Moreover, the government contends that those conditions

9    are not CDC-recognized high risk factors with respect to COVID-19.  (Doc. No. 516 at 9–10.)

10    According to the government, the CDC has not identified hyperlipidemia as a risk factor, and the

11    CDC identified general non-pulmonary hypertension and moderate-to-severe asthma as

12    conditions that "might" increase the risk of severe illness if one contracts COVID-19.  (*Id.*)  The

13    government also disputes the severity of defendant's asthma condition, focusing on the fact that

14    his medical records do not reflect that he has been diagnosed with "moderate to severe asthma."

15    (*Id.*)

16    In reply, defendant asserts that his asthma is "severe persistent" according to BOP's

17    Clinical Practice Guidelines for classifying asthma severity, because he uses a prescribed

18    albuterol inhaler multiples times per day and a prescribed Mometasone inhaled corticosteroid

19    daily for long term control of his asthma.  (Doc. Nos. 528 at 4–7; 528-1 at 2.)  Defendant also

20    points to his BOP medical records, filed with the court under seal, which reflect that both inhalers

21    have been consistently prescribed by the BOP to treat defendant's asthma since 2018.  (Doc. Nos.

22    528 at 5; 513 at 20–23, 37, 40; 514.)  In addition, defendant has filed a declaration from Dr.

23    Catherine A. Pearson, a practicing internal medicine physician and clinical instructor of infectious

24    diseases at the University of California, San Francisco, who concluded that defendant "closely

25    meets the criteria for severe-persistent asthma" based upon her review of defendant's BOP

26    medical records and defendant's declaration summarizing his symptoms.  (Doc. Nos. 528 at 6–7;

27    528-3 at 3–5.)  Defendant Amezcua does not dispute that hypertension alone merely *may* increase

28    the risk of severe illness from COVID-19, but does contend that in combination with his asthma,

12

1 and his age of 59 and history of cigarette smoking—for which there are higher rates of

2 hospitalizations and death from COVID-19 according to Dr. Pearson—he is in fact at a higher

3 risk of suffering severe illness if he were to contract COVID-19.  (Doc. No. 528 at 7–9.)

4       In its January 19, 2021 order denying defendant's motion for compassionate release, the

5 court noted it is undisputed that according to the CDC, "[a]dults of any age" who have certain

6 medical conditions including "moderate-to-severe asthma," or who have a history of smoking, are

7 "at increased risk of severe illness from the virus that causes COVID-19," and adults with

8 hypertension "might be at an increased risk for severe illness from the virus that causes COVID-

9 19." (Doc. No. 529 at 10) (citing *People with Certain Medical Conditions*, Centers for Disease

10 Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/

11 people-with-medical-conditions.html (version updated May 13, 2021); (Doc. Nos. 516 at 9–10;

12 528 at 6–8.))  The court found that regardless of whether defendant had been formally diagnosed

13 with moderate-to-severe asthma, his asthma condition and the symptoms he experienced have

14 been well documented over the last several years, including that he was prescribed albuterol and

15 corticosteroid inhalers by prison medical staff.  (Doc. No. 529 at 10.)  However, the court noted

16 that defendant had not argued that USP Victorville is unable to monitor and adequately treat his

17 medical conditions, noting in particular that "the medical records filed with the court under seal

18 suggest that USP Victorville is providing adequate medical care to defendant because he is being

19 prescribed and provided the medications necessary to self-care for his health conditions," and

20 thus the court was "not persuaded that the higher risk of severe illness from COVID-19 that

21 defendant faces, based on his medical conditions and history of smoking, rises to the level of an

22 extraordinary and compelling reason supporting compassionate release."  (*Id.*)

23       To counter the court's conclusion in this regard, in his brief on remand, defendant

24 Amezcua argues that USP Victorville has not been providing him with adequate medical care and

25 his medical condition is deteriorating.  (Doc. No. 535 at 2–3.)  Specifically, defendant Amezcua

26 filed a declaration dated April 29, 2021, in which he declares that his asthma has gotten worse

27 since December 2020 and provides two examples:  (1) he was able to play softball last year, but

28 now he can walk on the yard for just 15 minutes before he gets short of breath and has to sit

down, and (2) in early April 2021, he watched a fight break out from about 20 to 30 feet away

and the pepper spray used by guards to break up the fight made his "throat feel like it was on

fire," and he "coughed up blood for the next five days." (Doc. No. 535-1 at 2.) Defendant

contends that his declaration presents the court with a "starkly different picture" as to his asthma

condition than the picture suggested by the medical records because he declares that the cold and

dirty ventilation system at USP Victorville has exacerbated his asthma, triggering asthma attacks,

causing phlegm production in his chest, causing breathing trouble "almost every day." (Doc.

Nos. 535 at 2; 528-2 at 2–3.) Defendant Amezcua has also declared that he wakes up in the

middle of the night to use his albuterol inhaler and is fatigued throughout the day because he gets

only 3-4 hours of sleep if he is lucky. (*Id.* at 2.) In addition, defendant declares that for several

years, he has ended up taking approximately 100 puffs from other people's inhalers each month

when his monthly prescription runs out. (*Id.*) According to defendant, he "has presented ample

and compelling evidence that his ability to self-care is substantially diminished" because he does

not "get enough asthma medicine, he has a 36-year history of smoking, he can't avoid the

prison's ventilation system that exacerbates his condition, which is deteriorating, he is unable to

practice social distancing, and he has been given inadequate personal protective equipment."

(Doc. No. 535 at 3–4.)

In its brief on remand, the government disputes defendant's claim that his asthma has

worsened and emphasizes that the risks posed to defendant by COVID-19 have decreased

dramatically since the court's January 19, 2021 order because "[h]e is fully vaccinated, FCI

Victorville[8] ha[d] no confirmed COVID-positive inmates [as of the time of filing], and he already

contracted COVID-19 in December [2020] and recovered quickly with minimal symptoms."

(Doc. No. 538 at 1.) The government notes that the only evidentiary support defendant offers

regarding his allegedly worsening asthma is his own declarations, which the government contends

the contents thereof are inconsistent with defendant's medical records. (*Id.* at 2.) In particular,

defendant's "medical records reflect that he had 17 visits with BOP medical staff between

---

[8] Defendant Amezcua is incarcerated at USP Victorville, not FCI Victorville.

1    January 2019 and February 2021," and on six of those visits, BOP staff noted that his

2    pulmonary/respiratory condition was "clear to auscultation" (i.e., clear when listening to his

3    breath sounds using a stethoscope placed on his back) or "within normal limits." (*Id.* at 4; Doc.

4    No. 542 at 2–9, 11, 51–79, 118–128—sealed.) The government points to a note in defendant's

5    medical records from a medical visit on August 4, 2020, noting "Pulm: asthma: stable, no

6    significant duress. albuterol prn [when necessary] with exertion; rare otherwise." (Doc. Nos. 538

7    at 4; 542 at 74—sealed.) The government also points to the fact that defendant received a chest

8    x-ray on December 21, 2020 after testing positive for COVID-19, and the final report from that x-

9    ray states: "[l]ungs are clear . . . [n]o acute cardiopulmonary disease . . . [s]table radiographic

10   appearance of the chest compared to prior exam of 10/17/16." (Doc. Nos. 538 at 4; 542 at 181—

11   sealed.) Moreover, as to the asserted severity of defendant's COVID infection in December

12   2020, the government points to the medical records showing that BOP staff screened defendant

13   and checked his vital signs "on an almost daily basis" between December 16, 2020 and January 3,

14   2021, and the notes from those screenings state that defendant "denied having a cough, shortness

15   of breath, muscle pain, fatigue, sore throat, headache, nausea, loss of taste and smell, or chills."

16   (Doc. Nos. 538 at 5; 542 at 147–48, 187—sealed.) Thus, the government contends that

17   "[l]ooking to § 1B1.13 for guidance, or simply interpreting 'extraordinary' and 'compelling' as

18   those terms are commonly understood, [defendant] Amezcua has not shown that extraordinary

19   and compelling reasons justify his release." (Doc. No. 538 at 6.)

20        In his reply brief on remand, defendant asserts that the government ignores the several

21   cases that he has cited in which courts have "granted compassionate release in the wake of

22   *Aruda*," and which, according to him, "demonstrate in no uncertain terms that an inmate whose

23   medical conditions increase his risk of contracting COVID-19 presents extraordinary and

24   compelling reasons for release regardless of whether the prison is 'managing' his underlying

25   conditions." (Doc. No. 545 at 2.) In particular, defendant Amezcua cites to two cases in which

26   the court granted compassionate release to defendants who were similarly situated to him (two

27   middle-aged men suffering from well-documented, serious, and on-going health conditions and

28   who were incarcerated in facilities with few active COVID-19 cases reported). (Doc. No. 545 at

15

1–2) (citing *United States v. Barajas*, No. 2:13-cr-00233-TLN, 2021 WL 1696352, at *3 (E.D. Cal. Apr. 29, 2021); *United States v. Summerfield*, No. 2:06-cr-00428-KJM, 2021 WL 1517923, at *5 (E.D. Cal. Apr. 16, 2021)).  However, the court notes that both of those decisions pre-dated the widespread availability of COVID-19 vaccines to BOP staff and inmates.  Notably, in the order granting compassionate release in *Barajas*, the district court did not mention COVID-19 vaccinations at all.  In the order granting compassionate release in *Summerfield*, the district court noted that the BOP had reported "311 staff members have now been vaccinated, as have 286 out of more than 500 of those incarcerated," but "[n]either Mr. Summerfield nor the government states whether he has been vaccinated or whether he is scheduled to receive a vaccine by a certain date." *Summerfield*, 2021 WL 1517923 at * 4.  Here, in contrast, defendant Amezcua has been vaccinated.  Despite his being fully vaccinated against COVID-19, defendant argues that he nevertheless still faces risks "[i]n light of the persistence of breakthrough cases, the emergence of highly contagious and lethal variants, [his] own particular vulnerabilities, including [that] his immune system [is] suppressed by his prescribed corticosteroids."  (Doc. No. 545 at 3.)  The court, however, is not persuaded by defendant's argument in this regard.

First, defendant Amezcua has not persuasively argued that USP Victorville has failed to provide him adequate and appropriate medical care and treatment with respect to his COVID-19 infection in December 2020 or his asthma care generally.  Importantly, defendant Amezcua's medical records reflect that he received the first and second dose of the Pfizer-BioNTech COVID-19 vaccine in April and May 2021, respectively.  (Doc. Nos. 538 at 7; 542 at 210—sealed.)  According to the CDC, COVID-19 vaccines, like the Pfizer-BioNTech COVID-19 vaccine that defendant received, "are effective at protecting people from getting seriously ill, being hospitalized, and dying."  *See Stay Up to Date with COVID-19 Vaccines Including Boosters*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (updated Sept. 8, 2022).  This remains true even for individuals who have recovered from a COVID-19 infection.  *See id.* ("Getting a COVID-19 vaccine after you recover from COVID-19 infection provides added protection against COVID-19.")  At this point, medical evidence strongly suggests that fully vaccinated individuals are very

well protected against becoming severely ill from COVID-19, and courts have routinely

considered an individual's vaccination status when ruling on compassionate release motions.[9]

*See United States v. Pigford*, No. 2:20-cr-00414-MAK, 2022 WL 2019978, at *4 (E.D. Pa. June

6, 2022) (denying motion for compassionate release and noting that "[i]t is also well-settled

COVID-19 vaccinations 'are highly effective at preventing infection and . . . at reducing the

severity of symptoms' from COVID-19 and its presently known variants"); *United States v.*

*Johnson*, No. 18-cr-578-KM, 2022 WL 901468, at *4 (D.N.J. Mar. 28, 2022) (citing CDC

guidance and noting that "[COVID-19] vaccines are highly effective at preventing infection and,

when breakthrough infections occur, at reducing the severity of symptoms," and "[t]he wide

availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling");

*United States v. Gatson*, No. 13-cr-705-WJM, 2022 WL 1269785, at *2 (D.N.J. Apr. 28, 2022)

(same); *United States v. Hannigan*, No. 2:19-cr-373, 2022 WL 815449, at *15 (E.D. Pa. Mar. 17,

2022) ("Even in the era of the highly transmissible omicron variant, Moderna vaccination and

booster shot is highly effective against severe illness.").  Indeed, courts have routinely denied

motions for compassionate release even where brought by fully vaccinated individuals who suffer

from chronic medical conditions that increase their risk of severe illness or death from COVID-19

infection.  *See United States v. Willis*, No. 3:15-cr-00465-BR, 2021 WL 2179256, at *3-4 (D. Or.

---

[9]  The court recognizes that the meaning of "fully vaccinated" has changed over time as the CDC's recommendations have evolved to include vaccination "boosters" in addition to the initial vaccination "primary series."  *See Vaccines for COVID-19*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html (last reviewed Sept. 18, 2022).  Indeed, the CDC currently recommends staying "up to date" with vaccinations, meaning that individuals receive "all primary series doses and [monovalent and bivalent] boosters for their age group."  *See Stay Up to Date with COVID-19 Vaccines Including Boosters*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/ vaccines/stay-up-to-date.html.  The court is not aware whether defendant Amezcua was offered or received a booster vaccination, though according to BOP's website, "[i]nmates have also been offered booster shots in accordance with CDC guidance."  *See* https://www.bop.gov/coronavirus/ (last accessed Sept. 18, 2022).  The CDC's guidance in this regard is that "[c]orrectional and detention facilities should  ensure that vaccines and boosters are available for all residents and staff in order to stay up to date."  *See Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (updated May 3, 2022).

1   May 27, 2021) (concluding that federal prisoners who have been fully vaccinated but suffer from

2   chronic medical conditions that would put them at serious risk of severe illness from COVID-19

3   do not satisfy the extraordinary and compelling standard for compassionate release) (citing

4   cases); *United States v. Grummer*, 519 F. Supp. 3d 760, 763 (S.D. Cal. 2021) ("Although

5   Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates

6   the risk that he will contract COVID-19.  Other courts to address the issue have reached similar

7   conclusions."); *United States v. Ballenger*, No. 3:16-cr-5535-BHS, 2021 WL 308814, at *5 (W.D.

8   Wash. Jan. 29, 2021) ("[B]ecause [defendant] has already been infected and vaccinated, his

9   chronic medical conditions alone do not amount to an extraordinary and compelling reason to

10   warrant compassionate release.").

11         Second, even if defendant Amezcua's use of corticosteroids has suppressed his immune

12   system, the CDC's specific guidance for individuals who are "moderately or severely

13   immunocompromised" is to stay up to date on COVID-19 vaccinations, even though the

14   "immune response to COVID-19 vaccination may not be as strong as in people who are not

15   immunocompromised."  *See COVID-19 Vaccines for People Who Are Moderately or Severely*

16   *Immunocompromised*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/

17   coronavirus/2019-ncov/vaccines/recommendations/immuno.html (updated Sept. 14, 2022).

18         Third, the court recognizes that while defendant's motion has been pending, rates of

19   COVID-19 infection at USP Victorville over the past two years have fluctuated, as have national

20   rates of COVID-19 infections, with the ebbs and flows of variants and the distribution of vaccines

21   and boosters.  According to BOP's website, however, as of the date of the issuance of this order,

22   the overall COVID-19 statistics for USP Victorville are as follows:  1 inmate deaths, 0 staff

23   death, 500 inmates have recovered from COVID-19 infections, and 124 staff have recovered from

24   COVID-19 infections.  *See* https://www.bop.gov/coronavirus/ (last accessed Sept. 27, 2022).  The

25   court notes in particular that, as of September 27, 2022, there is only one confirmed active inmate

26   COVID-19 case and one confirmed active staff COVID-19 infection at USP Victorville.  (*Id.*)

27   Thus, the current conditions at USP Victorville do not at all suggest that extraordinary and

28   compelling reasons exist based on the risks posed to defendant by COVID-19 in that particular

1    facility.  *See also United States v. Gil*, No. 90-cr-306-KMW, 2022 WL 4245072, at *2 (S.D.N.Y.

2    Sept. 15, 2022) ("Since Gil filed his first motion, however, the threat from COVID-19 has

3    diminished nationwide and within the BOP," and "[t]here are currently only three confirmed

4    active cases of COVID at FCC Victorville, the facility at which Gil is housed, and the facility has

5    implemented safety measures to reduce the risk of infection.").

6          Accordingly, the court concludes that defendant Amezcua has not demonstrated that his

7    medical conditions, even in combination with the COVID-19-related conditions at USP

8    Victorville, support a finding that his ability to provide self-care within the prison setting has

9    been substantially diminished.  Thus, defendant has not shown that his medical conditions

10   constitute extraordinary and compelling reasons for compassionate release under § 3582(c)(1)(A).

11         2.       "Other Reasons" Warranting Compassionate Release

12         As noted above, the Sentencing Commission's policy statement—U.S.S.G. § 1B1.13—

13   sets forth the circumstances that constitute extraordinary and compelling reasons warranting

14   compassionate release under 18 U.S.C. § 3582(c) when motions are brought by the BOP Director.

15   However, when ruling on § 3582(c)(1)(A) motions brought by defendants, district courts may

16   also use that policy statement to inform their discretion in determining whether extraordinary and

17   compelling reasons warranting compassionate release exist.  *See Aruda*, 993 F.3d at 802.  With

18   that framework in mind and recognizing that the policy statement does not bind it, below the

19   court discusses U.S.S.G. § 1B1.13 to the extent it informs the court's analysis.

20         The application notes to U.S.S.G. § 1B1.13 provide greater specificity with respect to the

21   categories that qualify under the policy statement:  defendant's medical condition (subdivision

22   A), defendant's deteriorating health and age together (subdivision B), family circumstances

23   (subdivision C), or "other reasons" (subdivision D).  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).

24   Relevant here, subdivision D states:  "As determined by the Director of the Bureau of Prisons,

25   there exists in the defendant's case an extraordinary and compelling reason other than, or in

26   combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13,

27   cmt. n.1 (D).  As one district court has explained, subdivision D "acknowledges that there may be

28   other situations which constitute extraordinary and compelling reasons and provides a non-

specific blanket authorization for early release, labeled 'Other Reasons.'" *United States v. Beck*, 425 F. Supp. 3d 573, 578 (M.D.N.C. 2019).  Although subdivision D states that the BOP makes the determination regarding the existence of "other reasons," courts have recognized that they may independently assess whether "other reasons" exist because the applicable policy statement has not been amended since the enactment of the FSA, which authorizes defendants—not just the BOP—to bring motions pursuant to 18 U.S.C. § 3582(c).  *See id*; *United States v. Parker*, 461 F. Supp. 3d at 981 ("Pursuant to the FSA, the amended § 3582(c)(1)(A)(i) vests courts with independent discretion to determine whether there are extraordinary and compelling reasons to reduce a sentence.") (internal quotations omitted).

As summarized above, in 1993, defendant Amezcua was convicted of several serious drug trafficking offenses, including the manufacturing of more than 10 but less than 30 kilograms of methamphetamine as part of a large methamphetamine trafficking operation that he had orchestrated.  (Doc. Nos. 145, 147.)  The presentence report in his case determined that defendant Amezcua's prior criminal history placed him in category III and that his total offense level was 46, therefore calling for a life term of imprisonment under the mandatory sentencing guidelines in effect at the time of his sentencing in 1994.  (PSR at 16.)  Specifically, the presentence report stated that "[t]he guideline range in this case is life and therefore that is the sentence recommendation. . . .  [a] term of supervised release is recommended, although the defendant will not be released from custody unless the laws are changed."  (*Id.* at 17.)  On November 21, 1994, the sentencing judge adopted the PSR's recommendation and sentenced defendant to life imprisonment as to counts one, two, and three, with those terms to be served concurrently, followed by a 60-month term of supervised release, and imposed the mandatory $150 special assessments.  (Doc. Nos. 251, 287.)

Defendant Amezcua urges this court to now find that "other reasons" warranting his compassionate release exist based on the fact that he "would not be sentenced to a term of life imprisonment were he to be sentenced today under contemporary standards."  (Doc. No. 556 at 2.)  Defendant emphasizes that District Judge Myron D. Crocker sentenced him "under the mandatory pre-*Booker* regime to life imprisonment," and "[n]othing in the record of this case

suggests Judge Crocker would have imposed a life term had such a sentence not been
mandatory." (*Id.*) Defendant Amezcua also points to the undersigned's recent decision in *United
States v. Favela*, No. 1:94-cr-05044-DAD, granting compassionate release on the basis of "other
reasons," and contends that he is "similarly situated in all material respects to the defendant in
*Favela*." (*Id.* at 1–2.)

In response, the government argues that the court's decision in *Favela* should not impact
its analysis here because of material differences in the two cases, namely that defendant Amezcua
had a higher criminal history category of III and total offense level of 46 than the defendant in
*Favela* who had a criminal history category of I and a total offense level of 43. (Doc. No. 558 at
2.) The government emphasizes that, in contrast to the defendant's lack of criminal history in
*Favela*, defendant Amezcua's criminal history category was based in part on his conviction in
1991 for the infliction of corporal injury on his spouse, while his son was in the back seat of the
vehicle. (*Id.*) The government also emphasizes that, unlike the defendant in *Favela* who suffered
no prison disciplinary infractions, defendant "Amezcua has been sanctioned for several
disciplinary actions while in BOP custody." (*Id.* at 2.) In addition, while the government
recognizes that there is nothing in the record of defendant's sentencing "to suggest that Judge
Crocker would have imposed a life sentence had it not been mandatory," the government notes
that there is also nothing indicating that Judge Crocker considered anything but a life sentence.
(*Id.* at 3.)

In his supplemental reply brief, defendant points to this court's order dated January 19,
2021, in which the court found that defendant Amezcua has demonstrated his rehabilitation over
his many years in prison and that he does not pose an ongoing danger to the public. (Doc. No.
559 at 2) (citing Doc. No. 529 at 15). Defendant also counters the government implicit argument
that his offense was more aggravated and serious than the defendant in *Favela*, noting that the
defendant in *Favela* was convicted on six counts (compared to Amezcua's three) and was
responsible for almost 4 times the amount of methamphetamine that was attributed to defendant
Amezcua in this case. (Doc. No. 559 at 2–3.) Moreover, defendant notes that the defendant in
*Favela* had "committed his offense over a longer period of time." (*Id.* at 3.) Finally, defendant

21

1  argues that his "few, far between, and minor" prison disciplinary infractions (just 3 in the last 29

2  years) do not preclude the granting of compassionate release.  (*Id.*)

3        Having considered the parties' arguments, the court is not persuaded by the government's

4  attempts to distinguish this case from the circumstances that compelled the granting of

5  compassionate release in *Favela*.  Notably, the government does not challenge any of the analysis

6  in the *Favela* decision or the authority cited therein, including the district court's decision in

7  *United States v. Parker*, 461 F. Supp. 3d 966 (C.D. Cal. 2020), which the undersigned has found

8  to be particularly instructive.  The district court in *Parker* found extraordinary and compelling

9  reasons existed in that case to reduce defendant Parker's life sentence to "time served, followed

10  by five years of supervised release" in part because his life sentence was imposed under a

11  sentencing regime that is no longer valid post-*Booker*.  461 F. Supp. 3d at 985–86.  The court in

12  *Parker* explained its independent assessment and reasoning as follows:

13        In 2000, pursuant to the then-mandatory sentencing guidelines, the

14  Court sentenced Parker to life imprisonment.  In 2005, the Supreme Court subsequently determined in *Booker* that insofar as the

15  guidelines were mandatory, they were unconstitutional, rendering the guidelines "effectively advisory."  Courts have specifically

16  recognized the significance of *Booker* where, pursuant to other provisions of the FSA, inmates have sought reductions of sentences

17  imposed prior to *Booker*.  *See Jones*, 431 F. Supp. at 747 ("The retroactive nature of the [FSA] provides long-awaited relief to those

18  sentenced under the unconstitutionally imposed mandatory guideline ranges."); *accord United States v. Stanback*, 377 F. Supp.

19  3d 618, 625 (W.D. Va. 2019) ("The court finds that it has authority under 18 U.S.C. § 3582(c)(2) to modify Stanback's sentence, taking

20  into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a).").

21  461 F. Supp. 3d at 981.  The undersigned continues to agree with the reasoning employed by the

22  district court in *Parker*.

23        Here, defendant Amezcua was sentenced to life imprisonment solely because the

24  sentencing guidelines were considered mandatory in 1994; the sentencing court lacked discretion

25  to impose any other sentence absent a recognized ground for departure from the then mandatory

26  guidelines.  The undersigned further agrees that like the defendants in *Parker* and *Favela*,

27  defendant Amezcua "is currently serving life in prison, pursuant to a judgment rendered under a

28  sentencing regime that is no longer in effect and has since been declared unconstitutional."  *Id.*

1    The court recognizes that the Sentencing Guideline range applicable to defendant Amezcua has

2    not been altered by the Supreme Court's decision in *Booker*.  That is, even if defendant Amezcua

3    were to be sentenced today, his total offense level would still be 46—effectively 43[10]—and the

4    applicable advisory sentencing guideline range would still be "life."   But, importantly,

5    imposition of a life sentence would no longer be *mandated* because the Sentencing Guidelines are

6    no longer mandatory but are instead merely advisory.  *See United States v. Booker*, 543 U.S. 220

7    (2005) (declaring the Guidelines advisory).  Indeed, nothing in the record before the court

8    affirmatively suggests that the sentencing judge in this case would have imposed a life term of

9    imprisonment had such a sentence not then been mandatory.  The court is not persuaded by the

10   government's suggestion that the record's silence in this regard should be interpreted as a sign of

11   the inverse:  that the sentencing judge would have imposed a life term of imprisonment even if

12   the guidelines had been advisory at that time.

13          Moreover, as the court explained at the hearing on the pending motion and in its decision

14   in *Favela*, in the undersigned's many years of experience sentencing defendants in this heavily-

15   impacted district, which carries some of the heaviest criminal caseloads in the country, the court

16   has never imposed a sentence as long as the life sentence imposed on defendant Amezcua.  Given

17   the court's experience in this regard, and despite the fact that his applicable guideline range is still

18   "life," the court agrees with defendant Amezcua that he would not be sentenced to a term of life

19   imprisonment if he were to be sentenced today under contemporary standards.  As noted above,

20   *supra* n.6, defendant Amezcua has already effectively served a term of approximately 408 months

21   (just over 34 years) in federal prison, which is well above the low end of the "360 months to life"

22   guideline range for the total offense level of 42—one offense level below defendant's effective

23   offense level of 43.  Under these circumstances, the court finds that defendant Amezcua has

24   satisfied his burden of demonstrating the presence of "other reasons" establishing the existence of

25   extraordinary and compelling circumstances warranting a reduction in his life sentence.

26

27   [10]  Defendant Amezcua notes that according to the U.S. Sentencing Guidelines, "an offense level
     of more than 43 is to be treated as an offense level of 43."  (Doc. No. 559 at 2) (citing U.S.S.G.
28   Ch.5 Part A, n.2).

In reaching this conclusion, this court joins other courts that have similarly found that changes in sentencing law—including the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220 (2005) that the U.S. Sentencing Guidelines are advisory and their application cannot be mandatory, coupled with enactment of the FSA—can constitute extraordinary and compelling reasons that warrant the granting of compassionate release.  *See* e.g., *United States v. Jones*, No. 94-cr-20079-EJD, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (finding that "changes in sentencing law weigh strongly in favor of compassionate release" where "Mr. Jones was sentenced under a regime that has not only been held unconstitutional but has also been substantially amended to eliminate the brutal harshness of stacking").  In *Jones*, for instance, the district court emphasized that the severity of the defendant's sentence (29 years and 9 months incarceration after pleading guilty to armed robbery in 1994) was a result of the sentencing court "stacking" the then-mandatory sentences for multiple counts of using a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)—a practice that was eliminated by the FSA. *Id.* at *6.  The district court in *Jones* noted the gross disparity between that sentence—which the sentencing court had no choice but to impose—and the fact that today, the defendant would probably be sentenced to "14.75 years imprisonment, if not less."  *Id.* at *7.  At the time of the defendant's motion in *Jones*, he had already served over 25 years in prison, more than half his life.  *Id.*  Under those circumstances, the district court concluded that "Mr. Jones's continued incarceration is unjust" and joined "the growing majority of courts in holding that the 'sea changes' in sentencing law wrought by *Booker* and the FSA, . . . , weigh strongly in favor of reducing Mr. Jones's sentence."  *Id.* (citing cases).

Indeed, in light of recent Supreme Court and Ninth Circuit precedent, this court must consider the changes in sentencing laws when ruling on the pending motion.[11]  The Ninth Circuit has now held that in light of the Supreme Court's decision in *Concepcion*, courts must consider

---

[11]  In its supplemental response, the government does not dispute that changes in federal sentencing law post-*Booker* may constitute extraordinary and compelling reasons warranting compassionate release.  Rather, the government contends that the court should exercise its discretion to deny such a "rare" and "extraordinary" remedy here based on the specific facts of defendant Amezcua's case.  (Doc. No. 558 at 2.)

1   "non-retroactive changes in sentencing law" when evaluating compassionate release motions

2   brought under § 3582(c)(1)(A).  *See Chen*, 2022 WL 4231313, at *8 (citing *Concepcion*, 142 S.

3   Ct. at 2396) ("remand[ing] for the district court to reassess whether extraordinary and compelling

4   reasons exist when considering non-retroactive changes in sentencing law, in combination with

5   other factors particular to Chen's case," because "[t]he district court erred when it declined to

6   consider § 403(a)'s non-retroactive changes to § 924(c) stacked sentencing when evaluating

7   Chen's motion for compassionate release."); *see also United States v. Gonzalez*, No. 8:07-cr-

8   00202-DOC, 2022 WL 4119401, at *2 (C.D. Cal. July 11, 2022) (denying a motion for

9   compassionate release as to a defendant sentenced to a 240-month term of imprisonment, despite

10  the change of the applicable "mandatory minimum prison sentence" "from 20 years [240 months]

11  to 15 years" since the original sentencing, because the defendant's initial sentence was not based

12  solely on the mandatory minimum and "[w]ere the Court to resentence Defendant today with the

13  new mandatory minimum, the Court would impose a sentence within the Guideline range of no

14  fewer than 240 months.").

15          Accordingly, the court concludes that defendant Amezcua has met his burden of

16  demonstrating that "other reasons" exist constituting extraordinary and compelling reasons for the

17  granting of compassionate release in his case under § 3582(c)(1)(A).

18  **C.      Consistency With the § 3553(a) Factors**

19          Finally, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A) must be consistent

20  with the sentencing factors set forth in 18 U.S.C. § 3553(a).[12]  *See Parker*, 461 F. Supp. 3d at 979.

21

---

22  [12]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
    shall consider:  the nature and circumstances of the offense and the history and characteristics of

23  the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
    respect for the law, provide just punishment for the offense, afford adequate deterrence, protect

24  the public from further crimes of the defendant and provide the defendant with needed
    educational or vocational training, medical care, or other correctional treatment in the most

25  effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range
    established for the applicable category of offense committed by the applicable category of

26  defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing
    Commission; the need to avoid unwarranted sentence disparities among defendants with similar

27  records who have been found guilty of similar conduct; and the need to provide restitution to any

28  victims of the offense.

1    Here, consideration of the § 3553(a) sentencing factors support defendant Amezcua's release at

2    this time.

3          Defendant argues that a reduction of his sentence to time served is consistent with the

4    sentencing factors because:  (1) his offense was non-violent; (2) he has demonstrated remarkable

5    rehabilitation and remorse; (3) at age 60, his recidivism risk is low; and (4) he has already served

6    nearly 30 years in prison, which is "sufficient but not greater than necessary to effectuate the

7    traditional goals of sentencing."  (Doc. Nos. 509 at 11–12; 528 at 1, 13–14.)  Defendant asserts

8    that he has "built a solid record of achievements, obtaining his GED, successfully completing

9    classes, and working hard to become a valuable and trusted Unit Team orderly."  (Doc. No. 528 at

10   12.)  Defendant has also filed with the court letters of support written by other federal prisoners

11   who he has mentored, in which those inmates describe his guidance, kindness, and compassion.

12   (Doc. Nos. 528, 528-4.)  The undersigned pauses to note how compelling many of those letters

13   are.  (*See* Doc. Nos. 509-3, 528-4.)  It is apparent that defendant Amezcua has served as a

14   valuable and positive mentor to other younger federal prisoners during the service of his sentence.

15         The government counters that "[g]iven the nature and circumstances of Amezcua's

16   crimes, his criminal history, characteristics, and his threat to the public, a sentence reduction is

17   inconsistent with a careful weighing of the § 3553(a) factors and a sentence reduction is not

18   warranted."  (Doc. No. 516 at 12.)  In addition to the seriousness of defendant's drug-trafficking

19   activity which resulted in his convictions, the government emphasizes that defendant's criminal

20   history "includes reckless driving, inflict[ing] corporal injury on spouse, as well as arrests (but

21   not convictions) for assault with a deadly weapon, alien smuggling, and conspiracy to

22   manufacture methamphetamine."  (*Id.*)  The government also argues that defendant "poses a very

23   real danger to the community if released" because his conduct while in prison shows that he

24   remains dangerous, noting that defendant has been sanctioned for several disciplinary actions

25   while in BOP custody, including "rioting (2009), possession of drugs (2013), and possession of a

26   dangerous weapon (2017)."  (*Id.* at 11.)

27         In reply, defendant urges the court to consider that people can and do change over time,

28   and he cites to several district court decisions in which sentence reductions were granted in

26

similar circumstances, including reduction of life sentences, notwithstanding the seriousness of

the defendant's original drug-trafficking offense(s) and the occurrence of minor disciplinary

infractions while in custody.  (Doc. No. 528 at 11–13.)  As to his three prison disciplinary

incidents, defendant emphasizes that his disciplinary record was not cited by the warden at his

prison of confinement as a ground for denying his request for compassionate relief, and that the

BOP considered the 2009 rioting and 2013 possession of marijuana to be minor infractions as

shown by the minimal sanctions imposed upon him as a result (loss of commissary and

segregation and impoundment).  (*Id.* at 12–13.)  Defendant Amezcua has also explained that "[a]s

for the 2017 charge, for which [he] lost 41 days of good conduct time and six months commissary

privilege, a weapon was found in a holding cell [that he] had briefly occupied," and "[h]e denied

possessing the weapon and said it was not his."  (*Id.* at 13.)  Defendant contends that his "few, far

between, and minor" prison disciplinary incidents "pale before the solid record of

accomplishments and positive programming [he] has built since 1995," and "are simply not proof

[that] he would be a danger to society if released."  (*Id.*)  Further, according to defendant

Amezcua, upon his release from imprisonment, he will continue his rehabilitation by living with

his daughter Amy in Corcoran, California and seeking employment utilizing his skills "as a clerk,

handyman, teacher (art), and cook."  (Doc. No. 509 at 12.)

As an initial matter, the court notes that the fact that defendant is currently serving a life

sentence of imprisonment does not preclude the court from granting compassionate release.  Even

before the COVID-19 pandemic, courts recognized that circumstances could warrant the granting

of compassionate release even in the case of prisoners serving life sentences.  *See United States v.

McGraw*, No. 2:02-cr-00018-LJM, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (ordering

the compassionate release of a defendant who had served 16 years of his life sentence following

his conviction for conspiracy to possess with the intent to distribute and distribution of 20 pounds

of methamphetamine, and was now 72 years old and suffering from diabetes, hyperlipidemia,

emphysema, stage three kidney disease, and hepatitis C); *United States v. Kubinski*, No. 3:93-cr-

00028-H, 2020 WL 2475859, at *1 (E.D.N.C. May 13, 2020) (granting release despite the

imposition of four life sentences because the defendant's crimes were for nonviolent drug

distribution and conspiracy).  The court also agrees that the presence of relatively minor prison

disciplinary infractions in a defendant's record does not necessarily preclude the granting of

compassionate release.  *See Heffington*, 2020 WL 4476485, at *8 (concluding that "[e]ngaging in

a single prison fist-fight with no involvement of weapons over the course of living in prison for

27 years does not come close to outweighing all of the factors supporting defendant's

compassionate release"); *United States v. Neal*, No. 2:09-cr-00089-JAM-KJN, 2020 WL

4476718, at *3 (E.D. Cal. Aug. 4, 2020) (granting release despite expressing concern that the

defendant played a role in "two in-custody assaults over the past four years" because "viewing

[defendant's] record as a whole," "the steps she's taken toward self-reflection and rehabilitation

paint a more accurate picture of her time in prison than do the missteps she's made along the

way").

        The court recognizes the seriousness of defendant's offenses of conviction and agrees that

the nature of this offense is one that evinces a danger to the safety of the community.  Defendant

Amezcua was convicted in 1993 of very serious offenses—he led a conspiracy that produced for

distribution over 10 kilograms of methamphetamine.  (Doc. Nos. 145, 147.)  However, for that

offense, defendant has already served nearly 30 years in federal prison (or just over 34 years with

good time credits awarded).  (Doc. No. 528 at 2.)  In light of his demonstrated rehabilitation over

the last nearly 30 years in prison, the court is not persuaded by the government's argument that

defendant poses an ongoing danger to the public at this time.  The court agrees with the

government that rehabilitation alone is an insufficient basis upon which to grant compassionate

release., *see* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3.  Nonetheless, impressive

rehabilitation efforts such as those present in this case are obviously a relevant consideration

which, in this case, supports the granting of relief.  In the undersigned's view, a 34-year sentence

does reflect the seriousness of defendant's offenses of conviction, is sufficient to promote respect

for the law, and provides just punishment while also affording adequate deterrence to criminal

conduct.  *See* 18 U.S.C. § 3553(a)(2)(A), (B).

        In addition, the court notes that the docket in this case reflects that defendant Amezcua's

three co-defendants were also sentenced to terms of imprisonment, and none of those co-

defendants remain in BOP custody today.  Specifically, according to the docket and the BOP's inmate locator website, co-defendant Abraham Betancourt received a 324-month term of imprisonment and was released from confinement on July 31, 2015; co-defendant Lucio Betancourt was sentenced to a 292-month term of imprisonment and was released on July 24, 2014; and co-defendant Camarina (Camerina) Torres-Tapia also received a 292-month term and was released from custody on September 21, 2010.  Thus, granting defendant Amezcua's requested relief would not result, in the undersigned's view, in a sentencing disparity among his co-defendants because he has already served a term of imprisonment significantly longer than the terms of imprisonment served by his co-defendants—an appropriate result given defendant Amezcua's greater level of culpability as a leader and organizer of the drug trafficking conspiracy.

Accordingly, for all of the reasons addressed above, the court finds that the granting of defendant's motion for compassionate release is consistent with the sentencing factors set forth in §3553(a).

## CONCLUSION

For the reasons explained above, the court concludes that defendant Amezcua has demonstrated that "extraordinary and compelling reasons" exist warranting his compassionate release from prison.  Moreover, the court finds that the granting of release at this time is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).

Accordingly:

1. Defendant Amezcua's motion for compassionate release (Doc. Nos. 504, 509, 555) is granted;

2. Defendant's sentences on Counts 1 through 3 of life terms of imprisonment to be served concurrently, are reduced to a sentence of time served as to each of those counts;

3. Defendant's previously imposed 60-month term of supervised release is imposed and shall remain in full force and effect, that is upon defendant's release from imprisonment, he will be placed on supervised release for a term of 60 months on

Count 1, 60 months on Count 2, and 60 months on Count 3, all to be served concurrently for a total term of 60 months, which will become unsupervised, if the defendant is deported, under the following special and standard conditions:

a.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendant must report in person to the probation office in the district to which he is released.

b.  While on supervised release, the defendant must not commit another federal, state, or local crime and shall not illegally possess controlled substances. Defendant must cooperate in the collection of DNA as directed by the probation officer and shall comply with the standard conditions which have been recommended by the United States Sentencing Commission and adopted by this Court as set forth below.

c.  Further, defendant must refrain from any unlawful use of a controlled substance.  Defendant must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

SPECIAL CONDITIONS OF SUPERVISION

d.  Defendant must submit his person, property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer or any law enforcement officer at any time, based upon reasonable suspicion of unlawful conduct or a violation of a condition of supervision, without a search warrant. Failure to submit to a search may be grounds for revocation.  Defendant must warn any other occupants that the premises may be subject to searches pursuant to this condition.

e.  Defendant must submit to substance abuse/alcohol abuse testing to determine if he has used a prohibited substance.  Defendant must not attempt to obstruct or tamper with the testing methods.

f.   Defendant must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

g.   If defendant is deported, excluded or allowed to voluntarily return to his country of origin, he must remain outside the United States, unless legally authorized to re-enter.  If he re-enters the United States, he must report to the nearest probation office within 72 hours after his return; supervision is waived upon deportation, exclusion, or voluntary departure.

h.   Defendant must possess and use only those cellular phones and phone numbers (including Voice over Internet Protocol [VoIP] services) that have been disclosed to the probation officer upon commencement of supervision.  Any changes or additions are to be disclosed to the probation officer prior to the first use.

i.   Defendant must participate in a co-payment plan for treatment, testing and/or medication and shall make payment directly to the vendor under contract with the United States Probation Office.  Defendant's co-payment will be determined utilizing a Sliding Fee Scale based upon defendant's disposable income.

STANDARD CONDITIONS OF SUPERVISION

j.   Defendant must report to the probation office in the federal judicial district where he is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs defendant to report to a different probation office or within a different time frame.

k.   After initially reporting to the probation office, defendant will receive instructions from the Court or the probation officer about how and when defendant must report to the probation officer, and he must report to the probation officer as instructed.

31

l.  Defendant must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the Court or the probation officer.

m.  Defendant must answer truthfully the questions asked by the probation officer.

n.  Defendant must live at a place approved by the probation officer.  If defendant plans to change where he lives or anything about his living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

o.  Defendant must allow the probation officer to visit him at any time at his home or elsewhere, and must permit the probation officer to take any items prohibited by the conditions of defendant's supervision that the probation officer observes in plain view.

p.  Defendant must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses him from doing so.  If defendant does not have full-time employment, he must try to find full-time employment, unless the probation officer excuses him from doing so.

q.  If defendant plans to change where he works or anything about his work (such as his position or his job responsibilities), defendant must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

r.  Defendant must not communicate or interact with someone he know is engaged in criminal activity.  If defendant knows someone has been convicted of a felony, defendant must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

s.   If defendant is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

t.   Defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

u.   Defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

v.   If the probation officer determines that defendant poses a risk to another person (including an organization), the probation officer may require defendant to notify the person about the risk and defendant must comply with that instruction.  The probation officer may contact the person and confirm that defendant has notified the person about the risk.

w.   Defendant must follow the instructions of the probation officer related to the conditions of supervision.

4.   The Clerk of the Court is directed to now reassign this case to U.S. District Judge Ana I. de Alba for any further proceedings in this action before the district court.  The parties are advised that any future filings in this case in this district court shall bear the new case number of 1:93-cr-05046-ADA.

IT IS SO ORDERED.

Dated:   **October 12, 2022**

_____
UNITED STATES DISTRICT JUDGE